UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PAULINE DALE STONEHILL,                    :
                                           :
            Plaintiff,                     :        Civil Action No.:     1:19-cv-03770
                                           :
      v.                                   :        Re Document Nos.:   15, 16, 30, 36, 39
                                           :
U.S. DEPARTMENT OF JUSTICE                 :
TAX DIVISION,                              :
                                           :
            Defendant.                     :

## MEMORANDUM OPINION

GRANTING DEFENDANT'S MOTION FOR LEAVE TO FILE AN AMENDED ANSWER; GRANTING IN
PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING
IN PART AND DENYING IN PART PLAINTIFF'S CROSS-MOTION FOR PARTIAL SUMMARY
JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR A *VAUGHN* INDEX; AND DENYING
DEFENDANT'S CROSS-MOTION FOR AN ORDER ALLOWING THE TAX DIVISION TO SUBMIT A
SAMPLING *VAUGHN* INDEX

## I. INTRODUCTION

In 1962, Henry Stonehill's business enterprises in the Philippines were raided by the

Philippine National Bureau of Investigation ("NBI"), purportedly at the direction of the U.S.

Government.  First Am. Compl. ("Compl.") ¶ 8, ECF No. 8.  The evidence seized in those raids,

which was provided by the NBI to the United States, was used to pursue both civil and criminal

tax cases against Mr. Stonehill, *id.* at ¶ 15, and eventually resulted in a $17.6 million tax

judgment against Mr. Stonehill and his business associate, *see* Def.'s Statement of Undisputed

Material Facts ("Def. St. Facts") at ¶ 1, ECF No. 16-2.

      The three Freedom of Information Act ("FOIA") requests at issue in this case are the

most recent chapter in what is now over a half-century's worth of litigation as Mr. Stonehill, and

Ms. Stonehill on behalf of his estate, have sought to uncover the full extent of U.S. government

involvement and conduct in those raids and the subsequent litigation.  Pending before the Court

are the Tax Division's Motion for Leave to Amend its Answer, its Motion for Summary

Judgment, and Motion for an Order Allowing a Sampling *Vaughn* Index, along with Ms.

Stonehill's Cross-Motion for Partial Summary Judgment and Motion to Compel a *Vaughn* Index.

## II.  BACKGROUND

The full background to the present case is extensive; it "has spanned several decades and

involves events on multiple continents."  *Stonehill v. Internal Revenue Serv.*, No. 19-cv-3644,

2021 WL 1092166, at *1 (D.D.C. Mar. 22, 2021) (summarizing the history of the *Stonehill*

litigation in a separate FOIA matter).  Mr. Stonehill and his business associate were once

tremendously successful and influential figures in the Philippines, owning sixteen corporations

there, including U.S. Tobacco, in the mid-1900s.  *United States v. Est. of Stonehill*, 660 F.3d 415,

418 (9th Cir. 2011).  The U.S. government began to investigate Stonehill and his business

operations in the early 1950s, and eventually in 1962 the Philippine NBI conducted a massive

raid on all of Stonehill's businesses in the Philippines, the fruits of which were shared with the

U.S. government and eventually resulted in a multi-million dollar tax judgment.  *Id.* at 418–19.

Mr. Stonehill's first FOIA request was directed to the Department of Justice Criminal

Division and referred to the Tax Division in 1979.  Compl. ¶ 23; Ex. 1(a) of Am. Compl. Mot.,

ECF No. 7;[1] Def. St. Facts ¶ 6; Pl. Opp'n to Def. Mot. Summ. J. & Cross Mot. Partial Summ. J.

("Pl. MSJ") at 12, ECF No. 26.[2]  There is some ambiguity about the exact scope of that request,

but Exhibit 1(a) to the Complaint—which parties agree is a copy of the original request—appears

---

[1] Ms. Stonehill's Amended Complaint filed at ECF No. 8 referenced, but did not reattach, the same exhibits as the original complaint.  The exhibits can be found attached to the original Complaint, ECF No. 1, and the Unopposed Motion for Leave to File an Amended Complaint ("Am. Compl. Mot."), ECF No. 7.

[2] Stonehill's Opposition and Cross Motion for Summary Judgment was initially docketed at ECF No. 24 and ECF No. 30, but for simplicity the Court references the corrected version, which was resubmitted along with attachments in the Second Notice of Errata, ECF No. 26.

to generally request DOJ Records relating to Mr. Stonehill and the tax cases pending against him at that time.  Ex. 1(a) of Am. Compl. Mot. at 4.  In 1985, the Tax Division responded to that request by releasing 1,145 documents, partially withholding 151 documents, and fully withholding 103 documents.  Ex. 1(b) of Am. Compl. Mot.; Compl. ¶ 27; Def.'s Am. Answer ("Answer") ¶ 27, ECF No. 15-1.  Additional FOIA requests to the Tax Division and other federal agencies followed in the subsequent years, as well as a lengthy 60(b) motion to vacate the 1985 tax judgment and related discovery.  Compl. ¶¶ 28–29, 36; Def. St. Facts ¶¶ 3–4; *see also Stonehill v. Internal Revenue Serv.*, 534 F. Supp. 2d 1, 2–3 (D.D.C. 2008), *aff'd*, 558 F.3d 534 (D.C. Cir. 2009) (summarizing related FOIA and 60(b) litigation).

Of particular relevance to the present action, Mr. Stonehill filed a request to the DOJ Tax Division on February 22, 2000 that requested "all records . . . pertaining to Harry S. Stonehill and the United States Tobacco Company, during the period January, 1952 through December, 1976 . . . ."  Ex. 4 of Am. Compl. Mot.; Def. St. Facts ¶ 7; Compl. ¶ 54.  At least part of the motivation for this request appears to be that Mr. Stonehill's current attorney could not access the files released pursuant to the 1979 request.  Ex. 6(d) of Am. Compl. Mot. at 2 (letter from Tax Division in 2001 stating "I understand that when you started working for Messrs. Stonehill and Brooks you were unable to obtain from [the former attorney] the FOIA documents he had earlier received . . . .").

In August 2000, Mr. Stonehill filed a FOIA complaint in this district related to the 2000 request.  Compl. ¶ 60; Answer ¶ 60; Def. St. Facts ¶ 8 (citing *Heggestad v. FBI, et. al*, No. 1:00-cv-1960 (D.D.C.)).  In a series of letters, Mr. Stonehill and the Tax Division reached a settlement agreement to resolve the litigation in October 2000 and stipulated to a dismissal with prejudice in December 2000.  Compl. 62; Answer ¶ 62; Def. St. Facts ¶ 9; Ex. 3 of Def. Mot. Summ. J.

("Def. MSJ"), ECF No. 16.  In that agreement, the Tax Division agreed[3] to release all documents contained in the Department of Justice file in *United States v. Stonehill, et al.*, No. 65-cv-127, that were previously released following Mr. Stonehill's 1979 request, review the 254 documents which had been partially or entirely withheld from the 1979 request, release any additional documents if possible, and provide a *Vaughn* index for records it continued to withhold.  Def. St. Facts ¶ 9; Ex. 5(b) of Am. Compl. Mot. ¶¶ 3–4, 6 (copy of letter stating the terms of the settlement).  For his part, Mr. Stonehill agreed to:

> [D]ismiss the present FOIA lawsuit against the Tax Division with prejudice.  You agree not to challenge the exemption decisions in this FOIA lawsuit.  Further, you and your clients agree not to file any further FOIA or Privacy Act requests for documents in the Stonehill case files, in your own names or through agents or surrogates for seven years.  This agreement does not prejudice your right, where appropriate, to seek these documents in discovery in another action nor does it waive the rights of the Tax Division or the United States to raise any applicable defenses to such a discovery request.

*Id.* ¶ 7.  In a later settlement of a FOIA request for a specific deposition transcript, Ms. Stonehill again extended that prohibition by agreeing not to "file any FOIA request with the Tax Division and the Internal Revenue Service related in any way to Harry Stonehill or Robert Brooks" for another seven-year period.  Ex. 7(b) of Am. Compl. Mot. ¶ 2 (2006 settlement agreement); Compl. ¶¶ 96–97.

Mr. Stonehill passed away in 2002.  Compl. ¶ 85.  After his death and the Ninth Circuit remand of his 60(b) case, Compl. ¶ 88, Answer ¶ 88, Ms. Stonehill eventually obtained documents shedding new light on the government's actions leading up to the 1962 raid, Compl. ¶¶ 89–93.  Although the Ninth Circuit ultimately rejected the Stonehills' fraud-on-the-court argument and 60(b) motion, it acknowledged U.S.

---

[3] Other terms of the agreement not relevant to the current action have been omitted.

government misconduct before and after the raids, including that the government's attorney, John McCarthy, "was not entirely forthright in his representations to this court" in the original proceedings. *Est. of Stonehill*, 660 F.3d at 446. McCarthy was also hired by the Government as a consultant for the 60(b) proceedings, and his involvement in those later proceedings is the focus of one of the three requests at issue in the present action. *See* Pl. MSJ at 31–32.

In 2014 and 2015, a member of the news media named Bethany McLean submitted a series of FOIA requests relating to Mr. Stonehill. Compl. ¶¶ 107, 123, 128; Answer ¶¶ 107, 123, 128; Ex. 8(a) of Am. Compl. Mot. Those requests are relevant because they roughly correspond to the three requests at issue in this action, which themselves referenced the McLean requests and were submitted in September 2018:

- **Stonehill/Heggestad Request # 11240** broadly requested "[a]ll records from 1957–1976 concerning Mr. Stonehill," including but not limited to 23 sub-categories. Ex. 9(a) of Am. Compl. Mot.; Compl. ¶ 118; Answer ¶ 118. It indicated in the request that it was "substantially duplicative of the FOIA request filed by Bethany McLean" in October 2014 numbered 10817 and 10927, *id.*, which had requested all records relating to Mr. Stonehill in the same timeframe with 18 subcategories. Ex. 8(a) of Am. Compl. Mot.; Answer ¶ 107.

- **Stonehill/Heggestad Request # 11238** requested "[a]ll records concerning Philippine National Bureau of Investigation (NBI) Director, Jose G. Lukban ("Lukban") and NBI agent Damaso A. Nocon ("Nocon") from the period January 1, 1957 thru January 1, 1975," with nine non-exclusive subcategories. Ex. 10 of Am. Compl. Mot.; Compl. ¶ 126; Answer ¶ 126. It also requested "all documents or correspondence between January 1, 1999 and January 1, 2002 from or to [certain named individuals] related to the February 26, 2001 Declaration of Harold Child regarding Lukban and Nocon." Ex. 10 of Am. Compl. Mot. The request acknowledged that it was "substantially duplicative of the . . . FOIPA/TAX#10780" request filed by McLean in July 2014. *Id.*

- **Stonehill/Heggestad Request # 11239** requested "all records related to the Tax Division's retention of John J. McCarthy as a consultant and . . . all records and correspondence between John J. McCarthy and the Department of Justice related to" the *Stonehill* civil tax action between

1999 and 2012.  Ex. 11 of Am. Compl. Mot.; Def. St. Facts ¶ 27.  That request was substantially similar to McLean's request #10886, however, upon McLean's clarification, the prior search had been expanded to include *any* records naming or referencing John McCarthy in the time frame.  Ex. 11 of Am. Compl. Mot.; Def. St. Facts ¶ 28; Ex. 1 of Pl.'s Reply in Support of Partial Summ. J. ("Pl. Reply"), ECF No. 37.[4]

Although the Tax Division responded and provided some documents in response to McLean's requests,[5] *see* Compl. ¶¶ 116, 136, it never responded to the Stonehill requests, Compl. ¶¶ 121, 127, 138; Answer ¶¶ 121, 127, 138.[6]  Determining that the first two requests, # 11240 and # 11238, were duplicative of the requests previously submitted by McLean, and having confirmed with Ms. Stonehill's counsel that he did not need copies of the documents already released to McLean, "the Tax Division decided not to re-release or otherwise re-process the prior McLean requests substantially similar to Heggestad requests 11238 and 11240."  Def. St. Facts ¶ 24; Declaration of Carmen M. Banerjee ("Banerjee Decl.") ¶ 20, Ex. 1 of Def. MSJ; *see also* Pl.'s St. Material Facts in Genuine Dispute ¶ 12 (noting that Ms. Stonehill's attorney had stated he did not want copies of the same documents, but that he did not consent to the failure to reprocess the requests).

---

[4] The Court cites to Plaintiff's Reply and Exhibits in the corrected version attached to Ms. Stonehill's Second Notice of Errata in ECF No. 37, but the initial Reply was docketed at ECF No. 34.

[5] It is not apparent whether McLean received a response or any documents as a result of her second request, # 10780.  *See* Compl. ¶ 125.  In the context of the corresponding second Stonehill request, the Tax Division treated it as a subset of the documents in the first request.

[6] The parties are in agreement that Ms. Stonehill has adequately exhausted her administrative remedies with respect to all three requests, as is the Court.  *See Jud. Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003) ("A requester is considered to have constructively exhausted administrative remedies and may seek judicial review immediately if . . . the agency fails to answer the request within twenty days.") (citing 5 U.S.C. § 552(a)(6)(c)).

To respond to Ms. Stonehill's Request # 11239, the Tax Division reprocessed McLean request # 10886 after this suit commenced, as well as conducted a "supplemental search" that produced two additional records.  Def. St. Facts ¶ 25; Banerjee Decl. ¶¶ 21, 25, 54.  The Tax Division then conducted yet another supplemental search of a different database as briefing on these motions was ongoing, this time identifying nearly 8,000 responsive documents.  Supp. Decl. of Carmen M. Banerjee ("Banerjee Supp. Decl.") ¶¶ 17–18, 23, Ex. 1 of Def.'s Reply in support of Mot. Summ. J. & Opp'n to Pl.'s Cross-Mot. Partial Summ. J. ("Def. Reply"), ECF No. 29.

## III.  ANALYSIS

### A.  Defendant's Motion for Leave to Amend

First, the Tax Division seeks to amend its Answer to Ms. Stonehill's Amended Complaint "to admit the factual allegations contained in paragraphs 118, 126, and 137 of the amended complaint" and "to include *res judicata* as an affirmative defense."  Def.'s Mot. Leave to File Am. Answer ("Am. Answer Mot.") at 1, ECF No. 15.  Ms. Stonehill does not object to the former of these proposed amendments, but she opposes the Tax Division's assertion of *res judicata* as "futile and prejudicially belated."  Pl.'s Opp'n Def. Mot. for Leave to file Am. Answer ("Am. Answer Opp'n") at 1, ECF No. 20.

After the time to amend a pleading as a matter of course has passed, a party "may amend its pleading only with the opposing party's written consent or the court's leave," which should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Leave may be denied in the discretion of the court for reasons such as "undue delay, bad faith or dilatory motive on the part of the movant, . . .  undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment."  *Foman v. Davis*, 371 U.S. 178, 182 (1962).  However,

it is "entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be avoided on the basis of . . . mere technicalities," and leave should be given where possible in order to facilitate resolution of cases on the merits. *Id.* at 181; *see also Richardson v. United States*, 193 F.3d 545, 548–49 (D.C. Cir. 1999).

"In most cases delay alone is not a sufficient reason for denying leave . . . . If no prejudice [to the non-moving party] is found, the amendment will be allowed." *Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1084 (D.C. Cir. 1998) (alteration in original). "[U]ndue delay without prejudice is not sufficient to deny amendment . . . ." *Butler v. White*, 67 F. Supp. 3d 59, 68 (D.D.C. 2014) (citing *In re Vitamins Antitrust Litigation*, 217 F.R.D. 30, 33 (D.D.C. 2003). Ms. Stonehill argues that she will be prejudiced by even minimal delay in this case given her advanced age and the decades of "dilatory tactics" on the part of the Government. *See* Am. Answer Opp'n at 3, 5. While Ms. Stonehill's frustration is understandable, that long history does not make the delay in adding this specific affirmative defense prejudicial to her. The timing of the proposed amendment did not deprive Ms. Stonehill of a right to respond to that argument and it did not delay adjudication of the parties' cross motions for summary judgment, which addressed the issue as if it had been included in the answer. *Cf. Butler*, 67 F. Supp. 3d at 69 ("[P]laintiff was not unduly prejudiced by this delay, primarily because plaintiff was made aware that defendant intended to plead this affirmative defense . . . and indeed responded with a full-fledged argument . . . .").

Nor is the proposed amendment futile. "Courts may deny a motion to amend a complaint as futile . . . if the proposed claim would not survive a motion to dismiss," *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1099 (D.C. Cir. 1996), but "[c]ourts should be careful not to use the 'futility of amendment' standard as a shortcut for a properly filed and fully briefed

motion to dismiss," *Farouki v. Petra Int'l Banking Corp.*, No. 08-cv-2137, 2013 WL 12309520, at *3 (D.D.C. June 12, 2013).  Here, no shortcut is needed, nor is the asserted defense "so obviously deficient" that denial on futility grounds would be justified.  *Id.*  The Court will therefore deem the proposed amended answer to be operative and address the *res judicata* effect of the 2000 settlement agreement on the merits in the following section.

### B.  Legal Standard

The Freedom of Information Act is meant "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) (quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Accordingly, the FOIA statute "directs that 'each agency, upon any request for records . . . shall make the records promptly available to any person' unless the requested records fall within one of the statute's nine exemptions."  *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting 5 U.S.C. § 552(a)(3)(a)).   "The agency bears the burden of establishing that a claimed exemption applies," *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Just.*, 746 F.3d 1082, 1088 (D.C. Cir. 2014), and exemptions are "given a narrow compass," *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009) (citing *Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007)).  Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A "material" fact is one capable of affecting the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" if there is enough evidence for a

reasonable jury to return a verdict for the non-movant.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

To prevail on a motion for summary judgment in a FOIA case, "the defending agency must prove that each document that falls within the class requested either has been produced, is unidentifiable or is wholly exempt from the Act's inspection requirements."  *Weisberg v. U.S. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980) (internal quotation marks omitted) (quoting *Nat'l Cable Television Ass'n v. FCC*, 479 F.2d 183, 186 (D.C. Cir. 1973)).  A court "may award summary judgment solely on the basis of information provided by the department or agency in declarations" if "the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Citizens for Resp. & Ethics in Wash. v. U.S. Dep't of Labor*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Mil. Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981))).  An agency's justification for withholding records "is sufficient if it appears 'logical' or 'plausible.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Wolf v. C.I.A.*, 473 F.3d 370, 375 (D.C. Cir. 2007)); *Pinson v. U.S. Dep't of Just.*, No. 12-cv-1872, 2016 WL 29245, at *10 (D.D.C. Jan. 4, 2016).  Review is *de novo*, 5 U.S.C. § 552(a)(4)(B), but a reviewing court should "respect the expertise of an agency" and not "overstep the proper limits of the judicial role in FOIA review," *Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv.*, 608 F.2d 1381, 1388 (D.C. Cir. 1979).

### C.  Request # 11240

The Court begins with Request # 11240, by far the broadest of the three.  It sought "[a]ll records from 1957–1976 concerning Mr. Stonehill," including but not limited to 23 subcategories

and indicated that it was "substantially duplicative of the FOIA request[s] filed by Bethany McLean" in October 2014.  Ex. 9(a) of Am. Compl. Mot.; Compl. ¶ 118; Answer ¶ 118.  The Tax Division maintains that Request # 11240 is a "duplicate request[] for records the Tax Division released throughout several decades up to the year 2000," specifically the 1979 and 2000 FOIA requests,  Banerjee Decl. ¶¶ 13–16, and therefore that the 2000 settlement and stipulated dismissal bars the current action through *res judicata*.  Def.'s Mem. Supp. Mot. Summ. J. ("Def. MSJ Mem.") at 6, ECF No. 16-1.  The Tax Division has not processed Request # 11240.  Compl. ¶ 121; Answer ¶ 121; Banerjee Decl. ¶ 19.

### 1.  Res Judicata

The doctrine of *res judicata* serves to "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and prevent . . . piecemeal litigation"—all especially important considerations in a dispute as protracted as this one.  *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981); *see also Montana v. United States*, 440 U.S. 147, 153–54 (1979).  *Res judicata* consists of either claim preclusion or issue preclusion.  *I.A.M. Nat. Pension Fund v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946 (D.C. Cir. 1983).  Issue preclusion prevents "relitigation of issues actually litigated and determined in the prior suit, regardless of whether the subsequent suit is based on the same cause of action," whereas claim preclusion prevents relitigation where there has been "a final judgment on the merits in a prior suit involving the same parties or their privies . . . on the same cause of action." *Id.* at 946–47.

The prior litigation at issue here is the settlement agreement of the 2000 FOIA request litigated in *Heggestad v. FBI, et al*, No. 1:00-cv-1960 (D.D.C.).  *See* Def. MSJ Mem. at 9; Pl. MSJ at 27.  The parties filed a stipulation of dismissal under Rule 41(a)(1)(ii) that dismissed "all

claims in this case by plaintiff against the defendant Tax Division . . . with prejudice."
*Heggestad*, No. 1:00-cv-1960, ECF No. 10 (D.D.C. Dec. 29, 2000); Ex. 3 of Def. MSJ. Because
the parties settled and filed that stipulation before the court addressed any issues on the merits,
"claim preclusion" provides the appropriate framework here. Claim preclusion applies where the
prior and current litigation "(1) involve[es] the same claims or cause of action, (2) [is] between
the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4)
by a court of competent jurisdiction." *Smalls v. United States*, 471 F.3d 186, 192 (D.C. Cir.
2006); *see also Tembec Inc. v. United States*, 570 F. Supp. 2d 137, 140–41 (D.D.C. 2008); *Paley
v. Est. of Ogus*, 20 F. Supp. 2d 83, 87 (D.D.C. 1998).

Two of those elements present little difficulty. Although the prior action was captioned
with the name of Mr. Stonehill's attorney, it is undisputed that the 2000 request was filed on Mr.
Stonehill's behalf and that Ms. Stonehill is in privity with Mr. Stonehill as the representative of
his estate, satisfying the identity of parties element. Nor does either party argue that a court in
this district was not competent to hear the FOIA action in 2000, satisfying the fourth element.[7]

Next, the weight of authority[8] in this district suggests that a stipulation of dismissal with
prejudice under Rule 41(a) is a final judgment on the merits for the purpose of claim preclusion.

_____

[7] The record does suggest that in 2000 the Tax Division asserted a jurisdictional defense
based on Mr. Stonehill's alleged failure to exhaust administrative remedies, which the court
never ruled on. *See* Ex. 6(a) of Am. Compl. Mot. Although FOIA's exhaustion requirement is
jurisdictional in the sense that "failure to exhaust precludes judicial review if the purposes of
exhaustion and the particular administrative scheme support such a bar," it is not jurisdictional in
the sense that it divests a court of subject matter jurisdiction "because the FOIA does not
unequivocally make it so." *See Hidalgo v. F.B.I.*, 344 F.3d 1256, 1258–59 (D.C. Cir. 2003)
(internal quotations and citations omitted); *Wilbur v. C.I.A.*, 355 F.3d 675, 677 (D.C. Cir. 2004)
("[FOIA] exhaustion is a prudential consideration rather than a jurisdictional prerequisite . . . .").

[8] At least some cases have disagreed, holding that where a case has been voluntarily
dismissed by the parties pursuant to settlement but the stipulation "has not been integrated into a
consent decree or order of a court," it is not a judgment that precludes a later claim and is
effective only as a contract. *Lindell v. Landis Corp. 401(k) Plan*, 640 F. Supp. 2d 11, 16 (D.D.C.

*See Burns v. Fincke*, 197 F.2d 165, 166 (D.C. Cir. 1952) (construing the praecipes filed in a prior

suit as stipulations of voluntary dismissal under Rule 41(a) and stating that since they

"provide[d] for dismissal with prejudice, the first action is *res judicata* of the matters covered by

the cause of action"); *Tembec*, 570 F. Supp. 2d at 141 ("[A] stipulation of dismissal with

prejudice under Federal Rule of Civil Procedure 41(a)(1) is a final adjudication on the merits that

bars future suits based on the same cause of action."); *Doherty v. Turner Broad. Sys., Inc.*, No.

1:20-cv-00134, 2021 WL 326447, at *3 (D.D.C. Feb. 1, 2021) ("[E]ach of the stipulations of

dismissal with prejudice in Doherty's two prior suits constitutes a final judgment on the

merits."); *see also Citibank, N.A. v. Data Lease Fin. Corp.*, 904 F.2d 1498, 1501–02 (11th Cir.

1990) (holding that "a stipulation of dismissal with prejudice . . . at any stage of a judicial

proceeding, normally constitutes a final judgment on the merits which bars a later suit on the

same cause of action") (quoting 9 C. Wright & A. Miller, Federal Practice and Procedure § 2367

at 185–86 & n.36 (1971 & Supp. 1989)).

 Rather than arguing that the 2000 Settlement was not a final judgment on the merits, Ms.

Stonehill points out that because the stipulated dismissal is based on a settlement, it is the terms

---

2009) (holding that res judicata did not bar a claim where the prior stipulation of dismissal with
prejudice was entered voluntarily without an order of the court); *see also Gall v. S. Branch Nat'l
Bank of S.D.*, 783 F.2d 125, 127 (8th Cir. 1986) (holding that *res judicata* does not apply where
the "causes of action sought to be precluded in a subsequent proceeding were allegedly
determined in a stipulation or a judgment by consent").  This Court follows the weight of
precedent in determining that a stipulation of dismissal with prejudice under Rule 41(a) "bars
future suits based on the same cause of action." *Tembec*, 570 F. Supp. 2d at 141.  Although the
court in the underlying litigation did not separately enter an order dismissing the action with
prejudice, the stipulation itself unambiguously indicated that the dismissal was with prejudice
and was marked "let this be filed" with the signature of Judge Hogan.  Ex. 3 of Def. MSJ.  The
basic policy behind claim preclusion of avoiding piecemeal litigation by forcing parties to assert
all their claims arising out of a single action at once likewise weighs in favor of giving preclusive
effect the stipulated dismissal with prejudice.  *See Tembec*, 570 F. Supp. 2d at 141 ("While
Tembec could have litigated these claims in the 2005 suit, instead it chose to settle the dispute
and receive $242 million.").

of the settlement rather than the original complaint that define the outer limits of the preclusive effect.  *See Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1288 (11th Cir. 2004) ("Where the parties consent to . . . dismissal based on a settlement agreement, . . . the principles of *res judicata* apply . . . to the matters specified in the settlement agreement, rather than the original complaint."); *United States ex rel. Barajas v. Northrop Corp.*, 147 F.3d 905, 911 (9th Cir. 1998) ("A settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms.").  Ms. Stonehill contends that the seven-year limitation[9] on FOIA requests agreed to in the settlement left her free to request the same documents again, and challenge any asserted exemptions, after seven years had elapsed.  Pl. MSJ at 28.  The Tax Division unsurprisingly disagrees, saying it "did not leave room for Plaintiff to submit duplicative FOIA requests after seven years."  Def. Reply at 8.

The agreement is silent on whether the Stonehills can re-request the same documents after seven years, making both interpretations plausible.  Although it would normally be illogical in most causes of action to re-allow the same claim after a certain number of years, it is at least possible that the Tax Division perceived a benefit from kicking the can several years down the road and reprocessing a preexisting request in the meantime.  And FOIA is unlike other causes of action in that "the records maintained by an [agency] may change over time" meaning that even "a renewal of a previous request

---

[9] The full text of the relevant provision reads: "Promptly upon receiving the second release of documents and Vaughan [sic] Index, you shall dismiss the present FOIA lawsuit against the Tax Division with prejudice.  You agree not to challenge the exemption decisions in this FOIA lawsuit.  Further, you and your clients agree not to file any further FOIA or Privacy Act requests for documents in the Stonehill case files, in your own names or through agents or surrogates for seven years.  This agreement does not prejudice your right, where appropriate, to seek these documents in discovery in another action nor does it waive the rights of the Tax Division or the United States to raise any applicable defenses to such a discovery request."  Ex. 5(b) of Am. Compl. Mot. ¶ 7.

inevitably raises new factual questions." *Negley v. FBI*, 169 F. App'x 591, 594 (D.C. Cir. 2006). The applicability of some FOIA exemptions may be different in different years based on changes to the statute, regulations, executive orders, or simply as a function of the passage of time. *See, e.g.*, 5 U.S.C. § 552(b)(5) (removing the deliberative process privilege as an exemption for documents older than 25 years); 2d Decl. of Scott A Hodes ¶ 13, located at page 196 of Ex. 2 of Def. Mot., ECF No. 16-5 (describing how some Stonehill documents were declassified following later review under new executive orders). Indeed, the reprocessing of the 1979 request in connection with the 2000 settlement allegedly resulted in over 80 previously redacted documents being released in full. Compl. ¶ 71.

The Tax Division's *res judicata* argument also falters at the final element: whether both cases are for the "same claims or cause of action." *Smalls*, 471 F.3d at 192. Two claims are for "the same cause of action" if they are "based on the same nucleus of facts." *Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984) (internal quotations omitted). Here, that analysis essentially boils down to whether the requests in each litigation were for the same documents. *See Stonehill v. Internal Revenue Serv.*, No. 19-cv-3644, 2021 WL 1092166, at *2 (D.D.C. Mar. 22, 2021) (determining in a different Stonehill FOIA case that *res judicata* from the 2000 settlement agreement did not apply because "Plaintiff's current FOIA request seeks different records than were at issue in the prior litigation," specifically that "the earlier litigation centered on records that the IRS maintained about Harry Stonehill and its investigation of him" whereas the current request sought "records related to how the IRS responded to" the earlier requests).

The 2000 FOIA request at issue in *Heggestad v. FBI, et al*, No. 1:00-cv-1960 (D.D.C.) sought "all records . . . pertaining to Harry S. Stonehill and the United States Tobacco Company, during the period January, 1952 through December, 1976, including but not limited to" three subcategories. Ex. 4 of Am. Compl. Mot. The present request, # 11240, sought "all records concerning Harry S. Stonehill ("Stonehill") from the period January 1, 1957 thru [sic] January 1, 1976 including but not limited to" twenty-three subcategories. Ex. 9(a) of Am. Compl. Mot. While the requests are admittedly quite similar, the Court believes there is sufficient nuance between the two to caution against treating them as the same cause of action.

First, the 2000 request listed only three subcategories, whereas Request # 11240 lists twenty-three. Although both requests prefaced those subcategories with the phrase "including but not limited to," several of the listed subcategories functionally broadened the scope of the request in each. Many of the subcategories in Request # 11240 requested records relating to named individuals who were not referenced by name in the 2000 request, and for whom there could be some ambiguity about whether those documents were related to Mr. Stonehill. Ex. 9(a) of Am. Compl. Mot. To give just one hypothetical using an example, subcategory three of Request # 11240 requested "[a]ll records related to Ben Gromet." *Id.* A record relating to Gromet, even if located within the *Stonehill* litigation file, might arguably not have been responsive to the 2000 request if it did not otherwise "pertain to" Mr. Stonehill. In contrast, the fact that it was listed among the subcategories in Request # 11240 leaves no doubt that it would be responsive to Request # 11240.

Similarly, the 2000 request sought documents related to both Stonehill *and* U.S. Tobacco, whereas the present request seeks only documents related to Stonehill. *Compare* Ex. 4 of Am. Compl. Mot. *with* Ex. 9(a) of Am. Compl. Mot. That addition might arguably have made the

2000 request slightly narrower even as a matter of the overarching topic area. So, while the time period requested in # 11240 was more condensed, the subject matter was slightly broader. Even assuming that the 2000 settlement did preclude a future request based on any documents that could have been accessed through the 2000 request as written, it is possible that there are at least some potential responsive documents covered by the current request but not the previous one.

Given those nuances and the material disagreement between the parties about what the 2000 settlement agreement even precluded, the Court determines that summary judgment is not appropriate for Request # 11240. *See Potomac Elec. Power Co. v. Mirant Corp.*, 251 F. Supp. 2d 144, 149 (D.D.C. 2003) ("A court generally will not grant summary judgment where a contract is ambiguous because its interpretation inevitably would depend on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence."). *Res judicata* is an affirmative defense, *see* Fed. R. Civ. P. 8(c), and the Tax Division has not met its burden of showing it applies. The Court will therefore require the Tax Division to conduct a search for Request # 11240 consistent with this opinion and either release the responsive documents or submit sufficient evidence of any asserted exemptions on or before the date of its renewed motion for summary judgment.[10]

### D.  Request # 11238

The Court turns next to Request # 11238, which sought "[a]ll records concerning Philippine National Bureau of Investigation (NBI) Director, Jose G. Lukban ("Lukban") and NBI agent Damaso A. Nocon ("Nocon") from the period January 1, 1957 thru 1975," with nine non-exclusive subcategories. Ex. 10 of Am. Compl. Mot.; Compl. ¶ 126; Answer ¶ 126. Separately,

---

[10] The Court will also order the parties to jointly submit a proposed briefing schedule for the remaining issues in this case, taking into consideration the progress that has been made thus far.

it also requested "all documents or correspondence between January 1, 1999 and January 1, 2002 from or to [certain named individuals] related to the February 26, 2001 Declaration of Harold Child regarding Lukban and Nocon."  Ex. 10 of Am. Compl. Mot.  The request acknowledged that it was "substantially duplicative of the . . . FOIPA/TAX#10780" request filed by McLean in July 2014.  *Id.*

The Tax Division initially argued that this entire request was a subset of Request # 11240 and asserted the same *res judicata* argument.  Def. MSJ Mem. at 9; Banerjee Decl. ¶ 11.  But in its reply brief, the agency recognizes that it overlooked the second part of this request and indicated that it would begin searching for those documents.  Def. Reply 3–4.  The Tax Division now asks the Court to apply *res judicata* to Part 1 of the request (for documents relating to Lukban and Nocon from 1999–2012) and remand Part 2 (for documents relating to the February 26, 2001 Declaration of Harold Child regarding Lukban and Nocon) to the agency to conduct its search anew.  *Id.* at 4.

### 1.  Res Judicata Regarding Part 1

The Tax Division did not process Request # 11238 because it considered it a subset of the broader request # 11240.  Request # 11238 sought (in Part 1) "[a]ll records concerning Philippine National Bureau of Investigation (NBI) Director, Jose G. Lukban ("Lukban") and NBI agent Damaso A. Nocon ("Nocon") from the period January 1, 1957 thru 1975."  Ex. 10 of Am. Compl. Mot.  Request # 11240, in contrast, sought "all records concerning Harry S. Stonehill" from January 1, 1957 through January 1, 1976.[11]  The plain text of each request refers to different subject matter.

---

[11] The broad request relating to Stonehill listed twenty-three categories, one of which included correspondence between McCarthy and a list of individuals, two of whom were Nocon and Lukban.  Ex. 9(a) of Am. Compl. Mot.

The Tax Division's only explanation for its conclusion that # 11238 was a subset of # 11240, despite the different individuals who were the subject matter of each, is that "based on [Ms. Banerjee's] knowledge of the records the Tax Division maintains and the history of litigation between Stonehill and the United States, [she was] aware that the records in request Heggestad No. 11238 is a subset of the records related to the litigation files related to *United States v. Stonehill, et al.*, Civil No. 65-127 (C.D. Cal.)."  Banerjee Decl. ¶ 11.  In short, it appears that because Ms. Banerjee knew of Lukban and Nocon's connection to the *Stonehill* litigation, she made an assumption that the *Stonehill* litigation files were the only relevant location that those records might be found, and that any record referencing Lukban or Nocon in those files would also concern Mr. Stonehill.

Although overlap between the requests is highly likely, the assumption that the overlap was complete was unwarranted based on the language of the request, which the Tax Division had a duty to construe "liberally."  *See Nation Mag., Wash. Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995).  "Agencies must read and interpret a FOIA request as it was drafted, not as . . . an agency official . . . might wish it was drafted."  *Wilson v. U.S. Dep't of Transp.*, 730 F. Supp. 2d 140, 155 (D.D.C. 2010), *aff'd*, No. 10-5295, 2010 WL 5479580 (D.C. Cir. Dec. 30, 2010) (internal quotations and alterations omitted).  And "[r]eliance on an individual's knowledge of records does not fulfill an agency's obligation to search for responsive records."  *Colgan v. Dep't of Just.*, No. 14-cv-740, 2020 WL 2043828, at *5 (D.D.C. Apr. 28, 2020).  While the litigation files would certainly be a logical place to look for responsive records, it does not follow that it was the only possible place to look, or that there might be documents within those files responsive to one request but not the other.  Perhaps that will eventually turn out to be the case, but it does not relieve the Tax Division of its obligation to look.  "To conduct an

adequate search, an agency must . . . aver that all files likely to contain responsive materials (if such records exist) were searched." *Id.* (cleaned up).

The Court will therefore, with respect to Part 1 of Request # 11238, order the Tax Division to conduct a search and either release the responsive documents or submit sufficient evidence of any asserted exemptions on or before the date of its renewed motion for summary judgment.[12]

### 2.  Request for Remand Regarding Part 2

In its Reply and Opposition to Stonehill's cross motion, the Tax Division recognized for the first time that Request # 11238 was a two-part request.  Def. Reply at 4.  It now concedes that the second half of that request, which seeks "all documents or correspondence between January 1, 1999 and January 1, 2002 from or to McCarthy, Charles Duffy, Seth Heald, or Jennifer Whang related to the February 26, 2001 Declaration of Harrold Child regarding Lukban and Nocon" falls outside the scope of its *res judicata* defense and asks the Court to remand this sub-section of the request to the agency to process in the first instance, but also stated that it would begin searching for those records immediately.  *Id.* at 4 & n.2 (quoting Request # 11238).  Ms. Stonehill opposes a remand on the grounds that it will further delay the resolution of this dispute and instead asks the Court to order the Tax Division "to conduct a search for documents related to FOIA No. 11238 and to identify responsive documents within 60 days from the Order."  Pl. Reply at 2, 20.

---

[12] Because the Tax Division's *res judicata* arguments are based exclusively on this request being a subset of request # 11240, they are inapplicable here.  The Court also notes that the scope of "all documents related to Nocon and Lukban" is undoubtedly broader than the request for "meetings or correspondence" involving the two men that was requested in 2000.  *See* Ex. 4 of Am. Compl. Mot.

"[W]hen an agency search is demonstrated to be unreasonable, the FOIA plaintiff is entitled to judgment as a matter of law and a new search." *Jud. Watch, Inc. v. U.S. Dep't of Com.*, 34 F. Supp. 2d 28, 46 (D.D.C. 1998).  Here, the problem is not that the search in response to Request # 11238 was unreasonable, but rather that it was not conducted at all.  But the remedy is the same: Ms. Stonehill is entitled to have the agency conduct a search.  A district court reviewing a FOIA decision has wide discretion to order appropriate relief, including by giving specific instructions for a new search when necessary.[13]  *See id.* ("The requirements imposed upon the DOC in conducting this search are more restrictive and rigorous than those ordinarily ordered as relief in a FOIA case, but the egregious facts of this case make such requirements entirely necessary."); *Physicians for Hum. Rts. v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009) (ordering a new search with specified dates to define the temporal scope).

The Court is also mindful here of the considerable time that has already elapsed since this request was submitted in September 2018.  As the D.C. Circuit has admonished, "a delay of two years in the release of information to which the requester has a right of access is simply unacceptable as a matter of law, policy, and equity."  *Perry v. Block*, 684 F.2d 121, 129–30 (D.C. Cir. 1982).  So too here, where it has been over three years since Ms. Stonehill submitted Request # 11238.  Whether the Tax Division's failure to read an entire paragraph of the request was a careless or willful mistake is immaterial—either is unacceptable.  "The laudable aims of

---

[13] Although some courts have used the term "remand" when ordering a new FOIA search, those orders still gave specific instructions for the searches being ordered rather than giving the agency a blank slate to reconsider the request anew. *See, e.g.*, *Schaerr v. United States Dep't of Just.*, 435 F. Supp. 3d 99, 128 (D.D.C. 2020), *appeal dismissed*, No. 20-5065, 2020 WL 5642042 (D.C. Cir. July 8, 2020) ("The Court will remand the case to these agencies, and they are instructed to conduct further searches for records responsive . . . .") ); *Prison Legal News v. Lappin*, 603 F. Supp. 2d 124, 129 (D.D.C. 2009) ("[T]he Court must . . . remand this matter to the Bureau so that it may . . . conduct anew its searches . . . .").

the FOIA will pass beyond reach if federal agencies can through carelessness and procrastination frustrate the efforts of private citizens to gain access to government files." *Id.* And because the Tax Division indicated in its brief on July 14th, 2021 that it would commence searching for these documents immediately, the Court assumes that it has already made significant headway in processing this request since then. *See* Def. Reply at 4 n.2.

Therefore, with respect to Part 2 of Request # 11238, the Court orders the Tax Division to complete its search and release responsive documents on or before the date that its renewed motion for summary judgment is submitted. In the event that the Tax Division seeks to withhold any responsive documents in full or in part, it should submit a detailed affidavit or any other relevant documentation establishing the reasonableness of its search and withholdings at that time.

### E. Request # 11239

Finally, the Court addresses the search that the Tax Division did conduct: Request # 11239, which requested "all records related to the Tax Division's retention of John J. McCarthy as a consultant and . . . all records and correspondence between John J. McCarthy and the Department of Justice related to" the *Stonehill* civil tax action between 1999 and 2012. Ex. B of Banerjee Decl.; Def. St. Facts ¶ 27. The Tax Division reprocessed the prior corresponding McLean request from 2015 in order to respond and also conducted two additional searches during the course of this litigation that identified a total of 7,982 responsive pages. Def. St. Facts ¶ 25; Banerjee Decl. ¶¶ 21, 25, 54; Banerjee Supp. Decl. ¶ 23. It now claims that it has done all that FOIA requires and should be awarded summary judgment on that basis. Def. MSJ Mem. at 11–12.

### 1. Adequacy of Search

"[T]he adequacy of a FOIA search is generally determined not by the fruits of the search, but by the appropriateness of the methods used to carry out the search." *Jennings v. DOJ*, 230 F. App'x 1, 1 (D.C. Cir. 2007) (quoting *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003)). "An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Valencia–Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (internal quotation marks and citations omitted). The agency does not need to conduct a perfect search. *See Meeropol v. Meese*, 790 F.2d 942, 956 (D.C. Cir. 1986). But it must show that it "conduct[ed] a good faith, reasonable search of those systems of records likely to possess the requested records." *Pinson v. Dep't of Just.*, 313 F. Supp. 3d 88, 107 (D.D.C. 2018) (quoting *Marino v. Dep't of Just.*, 993 F. Supp. 2d 1, 9 (D.D.C. 2013) (internal quotation marks omitted)). To make this showing, an agency must submit "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed." *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). The burden then "shifts to the FOIA requester to produce countervailing evidence suggesting that a genuine dispute of material fact exists as to the adequacy of the search." *Dillon v. U.S. Dep't of Just.*, 444 F. Supp. 3d 67, 89 (D.D.C. 2020) (internal quotations omitted); *Pinson*, 313 F. Supp. 3d at 107. "Agency affidavits attesting to a reasonable search are afforded a presumption of good faith and can be rebutted only with evidence that the agency's search was not made in good faith." *Pinson v. U.S. Dep't of Just.*, 160 F. Supp. 3d 285, 293–94 (D.D.C. 2016) (internal quotations omitted).

The Tax Division's efforts to locate responsive documents are detailed in two affidavits of Carmen Banerjee, Senior Division Counsel for FOIA and Privacy Act Matters. *See generally*

Banerjee Decl.; Banerjee Supp. Decl.  To respond to the request, Ms. Banerjee first reprocessed the prior request from McLean that was similar in substance but that the Tax Division asserts was broader in scope than Ms. Stonehill's request at issue here.  Banerjee Decl. ¶ 25.  McLean's request, as clarified, sought "all records related to Mr. McCarthy regardless of whether he was 'retained' by the Tax Division," *id.* ¶ 37, and resulted in the Tax Division's search being expanded "to include any records dated January 1, 1999 to January 11, 2012 either naming or referencing John McCarthy in any Stonehill case context" as well as records relating to the retention of McCarthy in any capacity, *id.* ¶ 40.  In comparison, Ms. Stonehill's Request # 11239 sought all records related to the retention of McCarthy as a consultant and all records and correspondence between McCarthy and the Department of Justice relating to the *Stonehill* civil tax action between 1999 and 2012.  Ex. B of Banerjee Decl. (Request # 11239).  At least by those terms, Ms. Stonehill's request # 11239 was a slightly narrower subset of the McLean request.

While relying on a prior, broader request to facilitate the search for a narrower request may be a perfectly reasonable method in theory, it necessarily requires that the prior search also have been adequate—and there is considerable doubt as to whether that was the case.[14] McLean's request resulted in a full or partial release of 12 pages.  Banerjee Decl. ¶ 50.  Since this litigation has commenced, the Tax Division has conducted additional searches beyond the administrative file of McLean's request for documents responsive to Request # 11239 that resulted in significantly more documents being located.  *Id.* ¶¶ 55–67; Banerjee Supp. Decl. ¶¶ 17, 23.  For instance, Ms. Banerjee realized that the initial response she had received from the

---

[14] McLean's request is, of course, not before this Court, and the adequacy of that search is only discussed to the extent that it limited the agency's search in the present FOIA request.

Comptroller's Office in 2016, which provided a dollar amount of invoices for McCarthy's Services and stated that it had no hard copies of records,[15] must have been based on some electronic source.  Banerjee Decl. ¶ 59.  Ms. Banerjee followed up with the Comptroller's Office on that email in February 2021 and located an additional 2 pages of responsive documents as a printout from that system.  *Id.* ¶ 61.  She also reviewed files from related McLean requests other than the one at issue, *id.* ¶¶ 55–58, "surveyed the documents on shelves and cabinets on the seventh floor" to confirm that they were marked as having been reviewed, *id.* ¶ 65, and "surveyed some boxes in the FOIA file room," including assessing by "plain view" that the documents in open boxes pre-dated 1999 in part based on the texture of the paper, *id.* ¶ 66.

Most significantly, the Tax Division "became aware that it may be necessary to conduct an additional search" of a previously unsearched electronic database and did so only after submitting its summary judgment brief.  Banerjee Supp. Decl. ¶ 17.  That additional search consisted of searching "the electronic document management system-Workspace" "for e-mails, letters, [and] memoranda between Mr. McCarthy and Tax Division attorneys Seth Heald and Charles Duffy related to *United States v. Stonehill* . . . during the period January 1, 1999 and January 1, 2012," communications between those attorneys that referenced McCarthy, and *Stonehill* case documents created by all three individuals that referenced McCarthy.  *Id.* ¶¶ 18–20.  That search uncovered "721 items of records," about half of which were duplicates, resulting in an additional "7,982 pages of records responsive to" Request # 11239.  *Id.* ¶¶ 22–23.

---

[15] That email, dated March 22, 2016, informed Ms. Banerjee that the Comptroller's Office "did not possess contracting records from fifteen years ago."  Banerjee Decl. ¶ 45.  Ms. Banerjee does not say in her declaration whether records older than fifteen years were automatically destroyed pursuant to a document retention schedule or transferred to the custody of the National Archives.  The parties have not raised this point in their briefing and the Court will not speculate on it here, but such information would be helpful to include in future declarations.

Considering the initial and supplemental searches together, the Tax Division's search in response to Request # 11239 was reasonably calculated to uncover all responsive documents, and the declarations are sufficiently detailed regarding the steps that the agency took.  The search of the Workspace system allowed the Tax Division to tailor its search for responsive documents, and the affidavit described appropriate search parameters.  Banerjee Supp. Decl. ¶¶ 19–22.  This was in combination with other steps, such as having a specialist check the TaxDoc system, Banerjee Decl. ¶ 31,[16] "communicat[ing] with the attorney who has been handling the non-FOIA Stonehill litigation for several years" in order "to understand the general location of the records potentially responsive to the three McLean requests,"[17] *id.* ¶ 29, and reaching out to the Human Resources and Comptroller's Offices, *id.* ¶¶ 43–44.

Agency affidavits carry a presumption of good faith, and mistakes alone do not overcome that presumption. *Fischer v. U.S. Dep't of Just.*, 723 F. Supp. 2d 104, 108–09 (D.D.C. 2010).  The Court sympathizes that Ms. Stonehill is skeptical of the Government after such a contentious history, *see, e.g.*, Pl. Reply at 5–6, but "earlier intransigence ought not count against [the agency] if their later behavior was characterized by cooperation."  *Meeropol*, 790 F.2d at 952.  Indeed, "the institution of a de novo search" may even be evidence of good faith.  *Id.*; *see also Fischer*,

---

[16] Ms. Banerjee's first declaration states that the specialist searched two systems, but only goes on to discuss TaxDoc.  Banerjee Decl. ¶ 31.  While this apparent typo is an insufficient reason to deny the Tax Division summary judgment on the issue of the adequacy of this search, the Tax Division will most likely submit an additional affidavit regarding its search for Requests # 11238 and # 11240 in any event, and the Court would appreciate clarification on this particular point there.

[17] To the extent Ms. Stonehill potentially suggests that the involvement of a former attorney on the *Stonehill* cases renders the search suspect, there is no evidence of that.  *See* Pl. Reply at 10.  The attorney in fact helped the Tax Division locate the litigation files.  Banerjee Decl. ¶ 30.  And agency personnel can be a proper, or even necessary, source of information "if there is a close nexus, as here, between the person and the particular record."  *Valencia-Lucena*, 180 F.3d at 328.

723 F. Supp. 2d at 108 (rejecting the argument "that defendant's past lapses in producing requested information demonstrate a track record of bad faith that rebuts the presumption of good faith"); *see also Ellis v. U.S. Dep't of Just.*, 110 F. Supp. 3d 99, 105–06 (D.D.C. 2015), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016) (holding that an agency's search was not inadequate merely because it was conducted after the litigation commenced).  Ms. Stonehill does not point to any additional steps that the Tax Division should have taken beyond the supplemental searches, and speculation alone that more documents may exist does not make the search inadequate.  *See Meeropol*, 790 F.2d at 954–56.  The Court will therefore grant partial summary judgment to the Tax Division on the issue of the adequacy of the search.

The Court nevertheless pauses to note that agencies have a duty under FOIA to conduct a thorough and reasonable search whether they are under the scrutiny of a federal court or not.  *See* 5 U.S.C. § 552(a)(3)(C) ("In responding under this paragraph to a request for records, an agency *shall make reasonable efforts to search* for the records . . . .") (emphasis added); *Valencia-Lucena*, 180 F.3d at 325 ("While recognizing that the number of requests for information may pose burdens on agencies, Congress determined its ultimate policy of open government should take precedence.").  With the benefit of hindsight, the Tax Division's errors—such as failing to follow up on the 2016 email from the Comptroller's Office and forgetting to search an apparently powerful and well-suited database that eventually turned up several thousand additional pages—are troubling.  Such mistakes should have been rectified long before the agency was hauled into court and asked to prepare an affidavit of its efforts.  *See Jud. Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 895 F.3d 770, 781 (D.C. Cir. 2018) ("[I]t is long established in this circuit that an agency's compliance with FOIA depends upon its good faith effort and due diligence to comply with all lawful demands for records in as short a time as is possible.")

(internal quotations and alterations omitted); *Perry v. Block*, 684 F.2d 121, 129 (D.C. Cir. 1982)

("The laudable aims of the FOIA will pass beyond reach if federal agencies can through

carelessness and procrastination frustrate the efforts of private citizens to gain access to

government files.").  Although the Court will not penalize the Tax Division for "admit[ting] and

correct[ing] error when error is revealed" with respect to the adequacy of the search that

eventually occurred, *Meeropol*, 790 F.2d at 953, it takes this opportunity to urge greater care in

the future.

## 2.  Exemptions

The government agency bears the burden of justifying its withholding of any requested

material.  5 U.S.C. § 552(a)(4)(B); *see also Nat. Res. Def. Council v. Nuclear Regul. Comm'n*,

216 F.3d 1180, 1190 (D.C. Cir. 2000) ("FOIA itself places the burden on the agency to sustain

the lawfulness of specific withholdings in litigation.").  To satisfy this burden, "an agency may

rely on detailed affidavits, declarations, a *Vaughn* index, *in camera* review, or a combination of

these tools."  *Elec. Frontier Found. v. Dep't of Just.*, 57 F. Supp. 3d 54, 59 (D.D.C. 2014)

(quoting *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 111 (D.D.C. 2012)).  "[A]n agency's

justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"

*Scudder v. CIA*, 254 F. Supp. 3d 135, 140 (D.D.C. 2017) (quoting *Jud. Watch, Inc. v. U.S. Dep't*

*of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013)).  But "exemptions from disclosure must be narrowly

construed, and conclusory and generalized allegations of exemptions are" insufficient.  *Morley v.*

*CIA*, 508 F.3d 1108, 1114–15 (D.C. Cir. 2007) (internal quotations and citations omitted).

In its opening brief for summary judgment, the Tax Division stated that it identified

fifteen responsive pages, of which it released one in full, released five in part, and withheld nine

in full.  Def. Reply at 13; Banerjee Decl. ¶ 68.  But following the supplemental search conducted

in March 2021, the Tax Division stated in its Reply that it had identified 7,982 additional responsive pages, of which it released six in full, released one in part, and withheld 7,975.  Def. Reply at 13.  In both rounds of releases, the agency invoked Exemptions 5, 6, and 7(C), relying on Ms. Banerjee's declarations, to justify withholding those documents.

Following the new identification of documents in the Tax Division's Reply, Ms. Stonehill moved to compel production of a *Vaughn* index for the 7,975 pages now withheld.  *See* Pl.'s Mot. Compel Preparation of a *Vaughn* Index ("Pl. Index Mot."), ECF No. 36.  The Tax Division opposed and moved the Court, in the alternative, to allow it to prepare a Sampling *Vaughn* Index. *See* Def.'s Opp'n to Pl.'s Mot. Compel *Vaughn* Index & Cross-Mot. for Order Allowing Sampling *Vaughn* Index ("Def. Index Mot."), ECF 38.  The Court will first address the specific documents and exemptions that were identified in the Tax Division's opening brief before turning to the newly identified 7,982 pages and related cross-motions.

### a.  *Exemption 5: Deliberative Process, Attorney Work-Product, and Attorney-Client Privilege*

FOIA's fifth exemption covers "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency."[18]  5 U.S.C. § 552(b)(5).  This exemption protects documents that would be privileged in ordinary civil litigation.  *Loving*, 550 F.3d at 37.  The first round of identified documents withheld by the Tax Division under Exemption 5 rely on either the deliberative process privilege or the attorney work-product doctrine.

---

[18] The statute specifically provides that "the deliberative process privilege shall not apply to records created 25 years or more before the date on which the records were requested."  5 U.S.C. § 552(b)(5).  Because Request # 11239 requested documents starting in 1999 and the records were requested in 2019, that carve-out is inapplicable here.

The deliberative process privilege "protect[s] agencies from being 'forced to operate in a fishbowl.'" *U.S. Fish & Wildlife Serv. v. Sierra Club, Inc.*, 141 S. Ct. 777, 785 (2021) (quoting *EPA v. Mink*, 410 U.S. 73, 87 (1973)). It covers documents that are both predecisional and deliberative. *See id.* at 785–86; *see also Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 512 (D.C. Cir. 2011). "A document is predecisional if it was 'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." *Petroleum Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (quoting *Renegotiation Bd. v. Grumman Aircraft*, 421 U.S. 168, 184 (1975)). However, a document that was predecisional when prepared "can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). "It is deliberative if 'it reflects the give-and-take of the consultative process.'" *Am. Oversight v. U.S. Postal Serv.*, No. 20-cv-2580, 2021 WL 4355401, at *8 (D.D.C. Sept. 23, 2021) (quoting *Coastal States*, 617 F.2d at 866).

In contrast, the attorney work-product doctrine "provides a working attorney with a 'zone of privacy' within which to think, plan, weigh facts and evidence, candidly evaluate a client's case, and prepare legal theories." *Coastal States*, 617 F.2d at 864. The key limitation to this doctrine is that the document must have been "prepared in contemplation of litigation, or in the course of preparing for trial." *Id.* at 865. For an agency to meet its burden of showing the attorney work-product doctrine applies to a given document, "it must (1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some

indication of the type of litigation for which the document's use is at least foreseeable." *Ellis*, 110 F. Supp. 3d at 108.

Draft Letter from McCarthy to Judge Oberdorfer

The Tax Division invokes both the deliberative process privilege and attorney work product privilege to withhold a draft letter dated September 29, 2000, authored by McCarthy but unsigned, addressed to U.S. District Court Judge Louis F. Oberdorfer and discussing "a phone conversation McCarthy had with the Judge, and . . . how certain documents the Tax Division was attempting to access were significant to the court case." Def. MSJ Mem. at 19; Banerjee Decl. ¶ 81; Banerjee Supp. Decl. ¶ 9. Judge Oberdorfer was not connected to the 60(b) proceedings, rather, he had previously led the Tax Division in the 1960s and McCarthy had reached out to him for his recollection of certain records in the *Stonehill* case that were relevant to the ongoing 60(b) motion. Banerjee Supp. Decl. ¶ 8; Def. Reply at 15.

The Tax Division's first assertion that the letter was predecisional "because it relate[d] to the deliberations about (1) framing of the request for information from Judge Oberdorfer . . . and (2) how the government was ultimately going to respond to issues raised in Stonehill Rule 60(b) litigation" is unconvincing. Banerjee Supp. Decl. ¶ 8; Def. Reply at 15–16. This framing of the predecisional standard is too broad; the privilege does not protect any document that merely "relates" to some kind of agency deliberation, rather the document itself must be predecisional. The draft letter memorializes a phone conversation; any connection between the draft of the letter and a back-and-forth decision process about how the agency would respond to the 60(b) motion is just too tenuous of a connection to establish the privilege. And the Tax Division's argument that "final correspondence actually transmitted would have had to be reviewed and approved by a Tax Division supervising attorney before McCarthy would sign and send it,"

Banerjee Decl. ¶ 82, could potentially undermine the applicability of this doctrine.  If a supervising attorney approved it and McCarthy sent the letter in substantially the same form, the document would have represented the agency's final position on that particular issue anyhow, thus losing its predecisional nature. *See Coastal States*, 617 F.2d at 866.

The Tax Division also asserts the attorney work product privilege to withhold this letter in its reply,[19] and that assertion has more merit.  *See* Banerjee Supp. Decl. ¶ 9.  The agency has identified the draft letter's author, McCarthy, and described both its contents and the circumstances around its creation: seeking the recollection and input of a former Tax Division supervisor familiar with the underlying case.  It is also undisputed that the letter was drafted as part of the preparation for litigation in the 60(b) proceedings.  These showings are sufficient to establish that the work-product privilege applies.  *See Ellis*, 110 F. Supp. 3d at 108.  The Tax Division's description and explanation for the document is both "logical" and "plausible," therefore the Court will grant summary judgment to the Tax Division with respect to this document.  *Judicial Watch*, 715 F.3d at 941.

<u>McCarthy Letter to Miller and Attachment</u>

Next, the Tax Division asserts attorney work product[20] to withhold "a two-page letter and its attachment from McCarthy . . . to Herbert J. Miller," the "Assistant Attorney General of the Criminal Division."  Banerjee Decl. ¶ 83.  The Tax Division avers that the letter is dated September 25, 2000 and inquires about "Miller's recollection about certain evidentiary facts in

---

[19] Although the Tax Division did not assert this second doctrine until its reply brief, the Court finds that Ms. Stonehill was not prejudiced by its late assertion because she had the opportunity to respond in her subsequent reply in support of her cross-motion for summary judgment, and in fact did so.

[20] The Tax Division does not assert deliberative process privilege for this particular document. *See* Banerjee Decl. ¶ 83; Banerjee Supp. Decl. ¶ 10.

the old Stonehill case tax litigation" with specific reference to the 60(b) proceedings.  *Id.*  The

letter references several attachments, specifically three published court cases in the *Stonehill* tax

litigation and a "two page document."[21]  Banerjee Supp. Decl. ¶ 10.  The Tax Division declines

to provide any information about the content of the attachment, however, stating that

"[d]escribing . . . the contents or the subject of the letter attachment would reveal the evidentiary

issue or issues the letter discusses to an extent that it would thwart DOJ-Tax's assertion of

Exemption 5 with the attorney work product doctrine."  Banerjee Supp. Decl. ¶ 11.

      Ms. Stonehill does not appear to object to the withholding of the letter itself, but claims

that the Tax Division has not met its burden for withholding the attachment.[22]  Pl. MSJ at 39

(discussing both the letter and attachment and stating that "[t]here is no basis for asserting work

product privilege as it relates to the two page attachment").  The Court agrees.  While the context

of the document as being attached to the letter suggests that it was indeed prepared for use in the

60(b) litigation, the Tax Division omits significant other relevant detail, including who authored

it or even the most high-level description of its contents.  Because the agency has fallen short of

its burden of showing that the work product privilege properly applies to the attachment, the

Court will deny summary judgment for the agency with respect to that document.  "Where, as

here, an agency's descriptions fail to affirmatively establish each of the essential elements of the

claimed privilege, the district court has the discretion to order disclosure or to afford the agency

an additional opportunity to fully discharge its burden."  *Jud. Watch, Inc. v. U.S. Dep't of*

---

[21] The court decisions would not be responsive to the request, which specifically
excluded any documents filed in court proceedings.  *See* Ex. B of Banerjee Decl. (Request
# 1139).

[22] Ms. Stonehill appears to conflate the Tax Division's discussion of the attachment to the
Miller letter and the attachment to the 2:12 pm fax to Duffy.  *See* Pl. Reply at 19.  The Court will
nevertheless address each separately.

*Homeland Sec.*, 841 F. Supp. 2d 142, 155 (D.D.C. 2012).  Out of an abundance of caution the Court will stop short of ordering release, instead ordering the Tax Division to submit the two-page attachment to the Miller letter for *in camera* review.  In order to assess the context of the attachment, the Tax Division should also submit the two-page letter as well for *in camera* review.

Attachment to March 20, 2001, 2:12 PM Fax from McCarthy to Duffy

The Tax Division withheld "a two-page record McCarthy authored setting forth his views pertaining to one of the defendant's exhibits" under both attorney work-product and deliberative process privilege.  Banerjee Decl. ¶ 84; Banerjee Supp. Decl. ¶ 12.  That document was the attachment to a fax sent from McCarthy to Tax Division attorney Charles Duffy on March 20, 2001 at 2:12 pm, whose cover page was released in part and withheld in part under Exemptions 6 and 7(C).  Banerjee Decl. ¶¶ 70, 72, 84.  The cover page of the fax states that McCarthy had underlined what he considered the most important parts, *id.* ¶ 71, and the Tax Division asserts that the attachment "sets forth McCarthy's views about a hearing exhibit Stonehill and his co-defendant put forth in the 2001 litigation . . . .  includ[ing] references to a transcript of a hearing on March 5 discussing the hearing exhibit."  Banerjee Supp. Decl. ¶ 12.

The Tax Division has provided the necessary basic information regarding the content, nature, author, and circumstances surrounding the creation of this document, and it is undisputed that it was used in connection with ongoing litigation.  *Ellis*, 110 F. Supp. 3d at 108.  A discussion regarding the hearing exhibits in an ongoing litigation falls squarely within the "zone of privacy" that the attorney work product privilege is meant to protect.  *Coastal States*, 617 F.2d at 864.  This is particularly true given that its underlining and annotations show McCarthy's subjective determination of what was important—the classic "thoughts and opinions of counsel

developed in anticipation of litigation" covered by the privilege.  *See United States v. Deloitte LLP*, 610 F.3d 129, 136 (D.C. Cir. 2010).  Because the Court will grant summary judgment with respect to this document to the Tax Division, it need not address the applicability of the deliberative process privilege here.

Attachment to March 20, 2001, 2:35 PM Fax from McCarthy to Duffy

Finally, the Tax Division fully withheld the attachment to a second fax sent by McCarthy to Duffy on that same day at 2:35 pm based on attorney work product and the deliberative process privilege.  Banerjee Supp. Decl. ¶¶ 12, 16.  The Tax Division's opening brief and Ms. Banerjee's first declaration omitted any discussion of this attachment, which was pointed out by Ms. Stonehill's cross-motion.  Pl. MSJ at 40; Banerjee Supp. Decl. ¶ 13.  Ms. Banerjee's supplemental declaration specifies that, although the document was identified in 2016 during the processing of the McLean request, it was not discussed in the first brief because it had been misfoldered and therefore overlooked.  *See* Banerjee Supp. Decl. ¶¶ 14–15 ("Located [in] the 'Withheld in Full' subfolder of the 'Documents' folder were all the records DOJ-Tax withheld in full, including the attachment to the 2:12pm fax cover sheet, but not the attachment to the 2:35pm fax cover sheet . . . .  I discovered [the 2:35 pm attachment] in the folder called 'Documents' and not in the subfolder of it called 'Withheld in Full.'").  The Tax Division declares that the attachment is a three-page document consisting of "McCarthy's analysis regarding some arguments counsel for Stonehill and his co-defendant made at the hearing day of March 5th in the case" and that some lines of text are manually underlined.  *Id.* ¶ 16.  Although the fax transmission cover sheet suggests a four-page attachment, only three pages were identified and "the third page is filled only on the top one third or so of that page."  *Id.*

Much as with the 2:12 pm fax, the Tax Division has provided the necessary basic information regarding the content, nature, author, and circumstances surrounding the creation of this document, and connection to ongoing litigation. *Ellis*, 110 F. Supp. 3d at 108. And an evaluation of "arguments counsel for Stonehill and his co-defendant made at the hearing" is likewise the kind of thought process that the doctrine aims to protect. *See* Banerjee Supp. Decl. ¶ 16. The ability to candidly assess the strengths and weaknesses of an argument is at the very heart of legal advocacy, and protecting the confidentiality around such a conversation protects the integrity of the adversarial process itself. *See Hickman v. Taylor*, 329 U.S. 495, 511 (1947) ("Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten. An attorney's thoughts, heretofore inviolate, would not be his own. Inefficiency, unfairness and sharp practices would inevitably develop in the giving of legal advice and in the preparation of cases for trial. The effect on the legal profession would be demoralizing. And the interests of the clients and the cause of justice would be poorly served.").

One additional wrinkle remains with regard to this fax, however. Both parties indicate that the attachment should have been four pages, but Ms. Banerjee only identified and discussed three. Banerjee Supp. Decl. ¶ 16. While the mistake of forgetting the entire attachment in the first instance is unfortunate, the Court has already determined that the search as a whole was reasonable and does not believe the mistake undermines the credibility of the Tax Division in withholding what it has in fact located. *See Fischer*, 723 F. Supp. 2d at 109 ("[W]hether the agency located all copies of the records sought is not dispositive, for an agency's search is not presumed unreasonable if it fails to find every possibly responsive document."). The Court will therefore grant summary judgment to the Tax Division with respect to the three-page attachment

discussed here,[23] but it expresses no opinion as to the potentially missing fourth page. If the missing page is located during subsequent searches, the Tax Division must either release it or properly assert an appropriate exemption under FOIA.

### b. *Government Misconduct Exception to Work Product and Deliberative Process Doctrines*

In addition to contesting the application of these doctrines to the documents in question under Exemption 5, Ms. Stonehill argues that any privilege that could have applied should be overridden by the unethical conduct of the government, and most specifically, by McCarthy's actions in helping to prepare briefs in the 60(b) proceedings that contained information he knew to be false. Pl. Reply at 15–16. It is true that in "at least in some circumstances, a lawyer's unprofessional behavior may vitiate the work product privilege." *Moody v. Internal Revenue Serv.*, 654 F.2d 795, 800 (D.C. Cir. 1981). But that is an exceedingly narrow exception.

For starters, the attorney in *Moody* had "admitted engaging in" the unethical conduct, meaning it was not "a situation where disclosure is sought for the purpose of determining whether such misbehavior has in fact occurred," which could present "an exception which threatens to swallow the rule." *Id.* at 800 n.17. Ms. Stonehill's assertions about McCarthy's misconduct during the course of the 60(b) litigation are vigorously contested by the Tax Division, as is her assertion that the agency is attempting to effectuate a cover-up through further delay. *See, e.g.*, Def. Reply at 13–14; Pl. Reply at 16–17. Although the Ninth Circuit did find that in some respects McCarthy's statements to the court in the original suppression hearings "concealed, rather than revealed, the true state of affairs known to the government," *Est. of Stonehill*, 660 F.3d at 446, in other respects it largely vindicated McCarthy's conduct during the

---

[23] Again, having granted summary judgment on the basis of the attorney work product privilege, the Court has no need to address the deliberative process privilege.

original proceedings, *id.* at 449–51.  And that opinion examined only McCarthy's conduct during the underlying tax proceedings, not his conduct in the 60(b) proceedings, which are the subject of the current allegations.  "[A]tmospheric claims of wrongdoing" are insufficient to override a properly asserted exemption of privilege.  *Bartko v. U.S. Dep't of Just.*, No. 13-cv-1135, 2014 WL 12787631, at *8 (D.D.C. Oct. 8, 2014); *see also Leopold v. U.S. Dep't of Just.*, 487 F. Supp. 3d 1, 14 (D.D.C. 2020) (declining to apply the governmental misconduct exception where "plaintiffs' allegations do not concern any allegedly egregious discussion regarding what the Department has withheld, but rather allegedly egregious underlying conduct") (cleaned up).

Next, even where misconduct has occurred, "only tainted work product need be released." *Moody*, 654 F.2d at 801 n.20.  In other words, the plaintiff seeking to overcome a properly asserted Exemption 5 withholding must show that "the exempted records themselves constitute or are the fruit of wrongdoing." *Bartko*, 2014 WL 12787631, at *8.  Ms. Stonehill has not made that showing with respect to the documents discussed here.  Ms. Stonehill's broad— and disputed—claims that McCarthy engaged in unethical conduct during the 60(b) proceeding appear to boil down to the assumption that his misrepresentations in the original tax proceeding must have contaminated his conduct in the 60(b) proceeding.  This inferential leap is insufficient to draw a connection between any specific misconduct and the withheld documents.  And even if it did, "the client's interest in preventing disclosures about his case may survive the misfortune of his representation by an unscrupulous attorney" and so "[a] court must look to all the circumstances of the case . . . to decide whether the policy favoring disclosure outweighs the client's legitimate interest in secrecy." *Moody*, 654 F.2d at 801.  While the Tax Division's processing of this request has hardly been a model of bureaucratic efficiency, Ms. Stonehill's speculation about the agency's nefarious motivations for its delay and mistakes are both

unconvincing and insufficient to implicate the Tax Division itself in any wrongdoing by McCarthy even if it did occur.  The Court therefore declines to consider such allegations with respect to the attorney work product privilege.

Relatedly, deliberative process privilege may be overcome where "there is reason to believe the documents sought may shed light on government misconduct."  *In re Sealed Case*, 121 F.3d 729, 738 (D.C. Cir. 1997).  And "the government-misconduct exception may be invoked to overcome the deliberative-process privilege in a FOIA suit."  *Nat'l Whistleblower Ctr. v. Dep't of Health & Hum. Servs.*, 903 F. Supp. 2d 59, 67 (D.D.C. 2012) (addressing the allegations without determining the exact standard required but determining after *in camera* review that no misconduct had occurred).  However, because the Court has not granted summary judgment to the Tax Division based on its assertion of deliberative process privilege in the documents discussed above, the Court has no need to reach the application of that standard here.

### c. *Exemptions 6 and 7(C)*

Exemption 6 allows an agency to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  When evaluating this exemption, courts evaluate the "privacy interest in non-disclosure against the public interest in the release of the records in order to determine whether, on balance, the disclosure would work a clearly unwarranted invasion of personal privacy."  *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 874 (D.C. Cir. 1989)).  Similarly, Exemption 7(C) protects "records or information compiled for law enforcement purposes," and which, if disclosed, "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Both Exemptions 6 and 7(C) require courts to "balance the privacy interests that

would be compromised by disclosure against the public interest in release of the requested information." *Beck v. Dep't of Just.*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting *Davis v. U.S. Dep't of Just.*, 968 F.2d 1276, 1281 (D.C. Cir. 1992)).  However, "Exemption 7(C) is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015) (cleaned up); *see also U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 496 n.6 (1994) ("Exemptions 7(C) and 6 differ in the magnitude of the public interest that is required to override the respective privacy interests protected by the exemptions.").

The Tax Division invokes Exemptions 6 and 7(C) to withhold McCarthy's fax or telephone numbers, social security number, bar membership number, and contract company information on several specifically enumerated documents.  Banerjee Decl. ¶¶ 69–78.  Ms. Stonehill does not contest the propriety of those exemptions,[24] but argues that "'activity' information relating to McCarthy's retention as a consultant" should not have been redacted, and lists several specific examples including start date, initiate date, category, end date, and activity descriptions.  Pl. MSJ at 42.  She also points out that neither the Tax Division's brief nor Ms. Banerjee's declaration even mention, much less justify, those redactions.  *Id.*  The Tax Division's response is that Ms. Stonehill has "mischaracterized the withheld information," which in fact pertains only to McCarthy's "security clearance activity."  Def. Reply at 18.

The first step in balancing privacy interests with public disclosure under either Exemption 6 or 7(C) "is the identification of the privacy interests at stake."  *Stern v. FBI*, 737 F.2d 84, 91 (D.C. Cir. 1984).  But the Court cannot proceed past this step because there is a

---

[24] Nor does the Court take issue with them, and grants summary judgment to the Tax Division with respect to those specific partial withholdings.

genuine dispute of material fact about what the information to be disclosed even *is*.  It is entirely

logical that categories like "start date, initiate date, category, end date, and activity descriptions,"

*see* Pl. MSJ at 42 (cleaned up), on the document entitled "Contractor Information for John J.

McCarthy," *see* Banerjee Decl. ¶¶ 73–75, would cover basic information such as the dates of

employment.  The Tax Division fails to show how those categories relate to any security

clearance process rather than dates of employment or employment duties, and Ms. Stonehill

points out that there is in fact a different section of the same document describing security

clearance.  Pl. Reply at 19.  Although a government employee "has at least a minimal privacy

interest in his or her employment history," *Stern*, 737 F.2d at 91, the fact that McCarthy was

employed as a contractor in that general timeframe is already a matter of public record.  The Tax

Division provides no reason that disclosing those exact dates would be an "unwarranted invasion

of privacy," clear or otherwise.  *See* 5 U.S.C. §§ 552(b)(6), (7)(C); *Am. Oversight*, 2021 WL

4355401, at *11 ("It is generally well-accepted that federal employees do not have a reasonable

expectation of privacy in their titles . . . . ").

Because the Court does not have sufficient information to determine what information is

being partially withheld, it cannot properly perform the balancing required under either

Exemption.[25]  The Court will therefore deny summary judgment to the Tax Division on the

applicability of Exemption 6 or 7(C) to what is either "activity information" or "security

clearance information," and orders the Tax Division to either release that information or, if it

---

[25] Because of the similarity of the Exemptions, the Court also need not decide whether Exemption 7(C) was properly asserted to begin with.  Still, 7(C)'s protective standard derives from the fact that the very "mention of an individual's name" in law enforcement records could "engender comment and speculation and carries a stigmatizing connotation."  *Roth v. U.S. Dep't of Just.*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. U.S. Dep't of Just.*, 349 F.3d 657, 666 (D.C. Cir. 2003)).  That concern is not nearly as compelling for an attorney like McCarthy, whose involvement in prosecuting the case is already public knowledge.

continues to believe that redaction is still warranted, submit a copy of the documents it labeled "11239HEGG-0003 through 0004" with the disputed information highlighted rather than redacted for *in camera* review.

In the more recently discovered documents, the Tax Division also asserts Exemption 6 to justify withholding "the names of two individuals who appear to be lower-level staff" from an email chain between lawyer Charles Duffy and Joan Hawkins, the supervisory point of contact for purchase of services matters. Banerjee Supp. Decl. ¶¶ 27–28. Ms. Stonehill appears not to contest the withholding of those names, and the Court agrees. While the status of an individual as a federal employee may diminish their privacy interest, "the level of responsibility held by a federal employee" is also a relevant consideration when determining whether their involvement in a particular matter implicates a privacy interest. *See Stern*, 737 F.2d at 92–93 (determining that the privacy interest of low-level employees who were "entwined inadvertently" in government misconduct outweighed the public interest in learning their names). And "[t]he only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would 'shed light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 46 (quoting *U.S. Dep't of Def. v. Fed. Lab. Rels. Auth.*, 510 U.S. 487, 497 (1994)). The identity of the two low-level employees in the email does not "shed light on" the activities of the Tax Division. *See id.* Because their connection to the *Stonehill* litigation or McCarthy was tangential at best, there is no public interest in the release of their identities, and the Court grants summary judgment to the Tax Division on the appropriateness of that partial withholding.

### 3. Exemptions Asserted Following Supplemental Search

As described above, the Tax Division's supplemental search conducted after it submitted its opening brief identified an additional 7,982 pages of records responsive to the request, of which it withheld in full 7,975 pages, released in full six pages, and released in part one page.[26] Banerjee Supp. Decl. ¶ 23.  The Tax Division states that those nearly 8,000 pages are made up of approximately 360 different documents.  *Id.* ¶ 22.  For the vast majority of documents, the agency provides only a high-level summary and asserts attorney work-product and deliberative process privilege over all 7,975 pages withheld in full.  *Id.* ¶¶ 24–26.  Ms. Stonehill has responded with a motion to compel a *Vaughn* index for the approximately 360 newly discovered documents, arguing that "[a] general declaration about categories of withholdings is manifestly insufficient to permit the Court to evaluate whether the agency has properly invoked FOIA exemptions."  Pl. Index Mot. at 2.  The Court largely agrees.

#### a. Exemption 5 Privileges

Considering first the information the Tax Division provided, the agency described the categories of documents being withheld pursuant to these two privileges as:

> [D]rafts of briefs its attorneys and litigation consultant John "Jack" McCarthy prepared over the years in the Stonehill case; draft privilege logs pertaining to records in the Stonehill case; [] DOJ-Tax typed notes relating to litigation actions its attorneys and litigation consultant John "Jack" McCarthy prepared; e-mails between DOJ-Tax attorneys, including e-mails the [sic] include John "Jack" McCarthy as a recipient, or mention him and his work in the Stonehill case (one e-mail includes an Internal Revenue Service employee[]); Internal DOJ-Tax memoranda about the Stonehill case.

---

[26] The correctness of the partial withholding of two low-level employee names from an email chain under Exemption 6 has already been addressed and decided in the Tax Division's favor in the preceding section.

Banerjee Supp. Decl. ¶ 24.  The Tax Division refers to this list as a "Vaughn Declaration" and suggests that it is sufficient for the Court to rule in its favor.  Def. Index Mot. at 1.  A *Vaughn* Index, named for the case *Vaughn v. Rosen*, is "a system of itemizing and indexing that would correlate statements made in the Government's refusal justification with the actual portions of the document" and is meant to "assur[e] a proper justification by the governmental agency." 484 F.2d 820, 827 (D.C. Cir. 1973).  The *Vaughn* case itself illustrates why the agency's description of the categories here is so deficient: "From the record, we do not and cannot know whether a particular portion is [exempt under which category] . . . .  While it is not impossible, it seems highly unlikely that a particular element of the information sought would be exempt under both exemptions . . . . [and] it is preposterous to contend that all of the information is equally exempt under all of the alleged exemptions." *Id.* at 827–28.  Likewise, it seems highly improbable to the Court that all 7,975 pages here are equally exempt under both the deliberative process and attorney work product privileges.

Turning first to why these general categories do not satisfy the Tax Division's burden of showing the deliberative process privilege applies, "[w]hen the deliberative process privilege is at issue, the need for an agency to describe all of the information it withheld is particularly acute because the deliberative process privilege is so dependent upon the individual document and the role it plays in the administrative process." *Hunton & Williams LLP v. U.S. Env't Prot. Agency*, 248 F. Supp. 3d 220, 241 (D.D.C. 2017) (internal quotations omitted).  Once again, to qualify for the deliberative process privilege, a document must be both predecisional and deliberative. *Sierra Club, Inc.*, 141 S. Ct. at 785–86.  To meet its burden of showing this standard with reasonable specificity, an agency must generally provide "(1) the nature of the specific deliberative process involved, (2) the function and significance of the document in that process,

and (3) the nature of the decisionmaking authority vested in the document's author and recipient." *Hunton & Williams LLP*, 248 F. Supp. 3d at 243 (quoting *Nat'l Sec. Couns. v. CIA*, 960 F. Supp. 2d 101, 189 (D.D.C. 2013)).

The categories here do not clear that bar. While the list provides the function of some records, such as a draft privilege log or legal brief, other categories such as "emails between DOJ-Tax attorneys" and "internal DOJ-Tax memoranda" do not even supply the function of the document. Nor do any of the categories identify the deliberative process or the decisionmaking authority. All drafts are in some sense deliberative; there must be more detail provided regarding the actual decisionmaking process and authority, including the roles that "the document's author and recipient" played in that process. *Id.* "[A] court can only analyze whether a record is both predecisional and deliberative in relation to the relevant deliberative process. In other words, the timing of a record in relation to the adoption of agency policy is a crucial factor." *100Reporters LLC v. U.S. Dep't of Just.*, 248 F. Supp. 3d 115, 152 (D.D.C. 2017). There is insufficient information in the current record to determine what the deliberative processes are, much less whether the privilege applies.[27]

The detail provided is likewise insufficient to determine whether the documents are protected attorney work product. For an agency to meet its burden of showing the attorney work-product doctrine applies to a given document, "it must (1) provide a description of the

---

[27] Ms. Stonehill also notes that the Supplemental Declaration does not contain any segregability analysis. Pl.'s Reply in Supp. of Pl. Index Mot. at 6–7, ECF No. 40. This point is well taken to the extent that the Tax Division continues to rely on the deliberative process privilege to withhold any documents, since "if the government can segregate and disclose non-privileged factual information within a document, it must." *Loving*, 550 F.3d at 38. The same is not true where the asserted basis for withholding is attorney work product, and the agency need not perform a segregability analysis for documents where it has met its burden of showing the document is work product. *See Jud. Watch, Inc. v. Dep't of Just.*, 432 F.3d 366, 371 (D.C. Cir. 2005) ("If a document is fully protected as work product, then segregability is not required.").

nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis*, 110 F. Supp. 3d at 108.

Most of the categories described in the Tax Division's list have some connection to litigation, and specifically to the *Stonehill* 60(b) litigation. But "e-mails between DOJ-Tax attorneys, including e-mails [that] include . . . McCarthy as a recipient, or mention him and his work in the Stonehill case (one e-mail includes an Internal Revenue Service employee[)]" does not even allow for inference about how the emails were created in preparation for litigation. *See* Banerjee Supp. Decl. ¶ 24. A mere connection to litigation is not enough; the document must have been created because of it. *See Hunton & Williams LLP*, 248 F. Supp. 3d at 252 ("The Court must apply a '"because of" test, asking whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.'") (emphasis in original) (quoting *Deloitte LLP*, 610 F.3d at 137). Several other categories fail to specify an author or origin, including "draft privilege logs pertaining to records in the Stonehill case" and "[i]nternal DOJ-Tax memoranda about the Stonehill case." Banerjee Supp. Decl. ¶ 24. It seems likely to the Court that at least some of the withheld documents are in fact protected attorney work product, but it has no way of knowing which ones and finds the agency's blanket assertion unhelpful.

The Tax Division also asserts both privileges with respect to a partial withholding of the email chain discussed previously, which also redacted the names of two low-level employees. Banerjee Supp. Decl. ¶ 30. In that email, attorney Duffy explains to Executive Officer Young the need to contract McCarthy as a litigation consultant in the 60(b) proceedings, including his

opinion of why McCarthy's services were needed on the trial team. *Id.* ¶ 31. The information

provided suggests that this email was predecisional, because a decision to hire McCarthy had not

been made, and Duffy's perspective was aimed at "assist[ing] an agency decisionmaker in

arriving at" that decision. *Petroleum Info. Corp.*, 976 F.2d at 1434 (quoting *Renegotiation Bd.*,

421 U.S. at 184). Although the Tax Division does not indicate who the final decisionmaker was,

it sufficiently elucidates the roles the recipients on the email played in the overall process, as the

email also states that "[t]his will have to go to procurement." Banerjee Supp. Decl. ¶ 31. It is

also clear that the type of statement made by Duffy, as described by the Tax Division, is the kind

of "give-and-take of the consultative process" that makes a document deliberative. *Coastal

States*, 617 F.2d at 866. Because the Tax Division has only partially withheld the relevant

section and released the nonexempt factual information, the Court will grant the Tax Division

summary judgment on that email chain.[28]

Finally, the Tax Division asserts the attorney-client privilege as to "one e-mail between

DOJ-Tax attorneys and an Internal Revenue Service employee" without providing additional

detail on the subject matter of the email. Banerjee Supp. Decl. ¶ 26. "In the governmental

context, the 'client' may be the agency and the attorney may be an agency lawyer." *Tax Analysts

v. Internal Revenue Serv.*, 117 F.3d 607, 618 (D.C. Cir. 1997). But to establish the applicability

of this privilege, and therefore of Exemption 5, the agency must show that:

> (1) the holder of the privilege is, or sought to be, a client; (2) the person to whom
> the communication is made is a member of the bar . . . and, in connection with the
> communication at issue, is acting in his or her capacity as a lawyer; (3) the
> communication relates to a fact of which the attorney was informed by his client,

---

[28] Having found that the document meets the deliberative process privilege standard and
that segregability analysis was already conducted, the Court will not address whether the relevant
section would have met the attorney work product standard.

outside the presence of strangers, for the purpose of securing legal advice; and (4)
the privilege has been claimed by the client.

*Jud. Watch, Inc.*, 841 F. Supp. 2d at 153–54 (citing *In re Sealed Case*, 737 F.2d 94, 98–99 (D.C.

Cir. 1984)).

Although the Court could assume that the DOJ Tax attorneys on the email were members

of the bar, there is nothing indicating that the IRS employee was a client or the attorneys were

acting in their capacity as lawyers, or that the communication was confidential or even legal in

nature.  Such a lack of detail falls far short of the Tax Division's burden, and the Court will deny

summary judgment to the Tax Division for this record.

### b. *Cross-Motions for a* Vaughn *Index or Sampling* Vaughn *Index*

Given the inadequacy of the Tax Division's asserted exemptions for all but one partially

withheld record in the group of most recently discovered documents,[29] the Court will grant Ms.

Stonehill's motion to compel a *Vaughn* Index providing more sufficient detail on each of these

categories.  Perhaps sensing the weakness of its initial submission, the Tax Division has

suggested in its opposition and cross motion "that a sampling *Vaughn* index would be [a] more

appropriate and efficient mechanism to test the government's exemption 5 withholdings."  Def.

Index Mot. at 2.  A random sampling index may be appropriate in some instances and is within

the discretion of the district court, *In re U.S. Dep't of Def.*, 848 F.2d 232, 238 (D.C. Cir. 1988),

but a court must still fulfill its duty under FOIA to conduct a *de novo* review of the agency

decision, 5 U.S.C. § 552(a)(4)(B).

---

[29] The Tax Division briefly argues that an order compelling a *Vaughn* Index would be
premature before the Court has considered the summary judgment briefing.  Def. Index Mot. at
1.  The Court has considered the information provided in the context of the summary judgment
briefing and finds it lacking, making the motion to compel fully ripe for consideration.

The voluminous nature of the pages to be indexed is proper consideration, but there is no magic number or sampling ratio that automatically makes a sample appropriate; rather, the determination must always be made with reference to the particular facts of the case.  The precedent the Tax Division cites, while allowing for sampling indexes in special circumstances, does not suggest otherwise.  *See, e.g.*, *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1489–90 (D.C. Cir. 1984) (ordering two separate sampling indexes in a case with over 60,000 pages with partial redactions and ordering *in camera* review of other documents withheld in full); *Meeropol*, 790 F.2d at 959 (affirming a 1% sample of over 300 documents in conjunction with relatively detailed affidavits); Order at 7, *All. Defending Freedom v. Internal Revenue Serv.*, No. 15-cv-525 (D.D.C. Dec. 22, 2016), ECF No. 23 (allowing for a 2% random sample of over 10,000 documents withheld in full but noting "the Court retains the authority to order the filing of an improved *Vaughn* Index" if needed); *Bonner v. U.S. Dep't of State*, 928 F.2d 1148, 1151–52 (D.C. Cir. 1991) (accepting that 63 documents out of 1,776 selected by agreement of the parties was an appropriate sample but holding that the district court should have examined the documents from that sample that were later released in order to determine whether the release undermined the representative nature of the remaining sample).

Here, a sampling index would be insufficient to establish the correctness of the Tax Division's asserted exemptions.  As Ms. Stonehill points out, while the number of *pages* is relatively large, the number of *documents* is much more manageable.  Pl.'s Opp'n to Cross Mot. Sampling *Vaughn* Index at 1–2, ECF No. 41.  There are only approximately 360 discrete documents, but the high page count is driven by the fact that several (such as the draft legal

briefs) are presumably each many pages long.[30]  *See* Banerjee Supp. Decl. ¶ 22.  Not only does

the lower number of documents with many pages make a complete *Vaughn* Index more feasible,

it also means that any random page selected for a sample is less likely to contain enough context

to meaningfully evaluate the whole.  Accordingly, the Court will grant Ms. Stonehill's motion to

compel a *Vaughn* Index and deny the Tax Division's cross motion for a sampling *Vaughn* Index.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Leave to File an Amended Answer

(ECF No. 15) is **GRANTED**; Defendant's Motion for Summary Judgment (ECF No. 16) is

**GRANTED IN PART AND DENIED IN PART**; Plaintiff's Cross-Motion for Partial Summary

Judgment (ECF No. 30) is **GRANTED IN PART AND DENIED IN PART**; Plaintiff's Motion

for a *Vaughn* Index (ECF No. 36) is **GRANTED**; and Defendant's Cross-Motion for an Order

Allowing the Tax Division to Submit a Sampling *Vaughn* Index (ECF No. 39) is **DENIED**.  An

order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  February 10, 2022                                      RUDOLPH CONTRERAS
                                                               United States District Judge

---

[30] Ms. Stonehill appears to concede that the draft briefs are likely privileged and suggests "that it is necessary only to identify the date of the draft brief and the author and recipient for purposes of deliberative process and work product privilege claims."  Pl.'s Opp'n to Cross Mot. Sampling *Vaughn* Index at 2.  The Court agrees that those details, along with the general topic of the brief in question, would be sufficient when the agency submits its *Vaughn* Index for documents identified as draft legal briefs, which would also help alleviate the burden of preparing the index.